UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY MICHAEL
SNYDER,

              Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

              Defendant.

Case No. 2:20-cv-12102
District Judge Gershwin A. Drain
Magistrate Judge Anthony P. Patti

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR REMAND PURSUANT TO SENTENCE FOUR (ECF No. 15), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 20), and AFFIRM THE COMMISSIONER'S DECISION

**I.**    **RECOMMENDATION**:  For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for remand pursuant

to Sentence Four (ECF No. 15), **GRANT** Defendant's motion for summary

judgment (ECF No. 20), and **AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

Plaintiff, Rodney Michael Snyder, brings this action under 42 U.S.C. §

405(g) for review of a final decision of the Commissioner of Social Security

(Commissioner) denying his application for disability insurance (DI) benefits.

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for remand pursuant to Sentence Four

(ECF No. 15), the Commissioner's cross-motion for summary judgment (ECF No.

20), Plaintiff's reply (ECF No. 21), and the administrative record (ECF No. 11).

### A.    Background and Administrative History

Plaintiff alleges his disability began on March 3, 2016, at the age of 50.

(ECF No. 11, PageID.233.)  He filed an application for disability insurance (DI) on

January 30, 2017.  (*Id*.)  In his disability report, he lists several conditions

(dizziness, headaches, depression, right shoulder pain, right arm twitching, right

leg twitching) as limiting his ability to work.  (*Id*., PageID.259.)  His application

was denied on June 22, 2017.  (*Id*., PageID.117-133, 146-153.)

Plaintiff requested a hearing by an Administrative Law Judge (ALJ).  (*Id*.,

PageID.158-159.)  On April 24, 2019, ALJ Genevieve Adamo held a hearing, at

which Plaintiff and a vocational expert (VE), Scott Silver, testified.  (*Id*.,

PageID.78-116, 356.)  On July 16, 2019, ALJ Adamo issued an opinion, which

determined that Plaintiff was not disabled within the meaning of the Social

Security Act.  (*Id*., PageID.50-76.)

Plaintiff submitted a request for review of the hearing decision/order.  (*Id*.,

PageID.227-232.)  However, on June 29, 2020, the Appeals Council denied

Plaintiff's request for review.  (*Id*., PageID.37-42.)  Thus, ALJ Adamo's decision

became the Commissioner's final decision.

Plaintiff timely commenced the instant action on August 5, 2020.  (ECF No. 1.)

### B.     Plaintiff's Medical History

The administrative record contains approximately 665 pages of medical records, which were available to the ALJ at the time of her July 16, 2019 decision. (ECF No. 11, PageID.76, 378-1042 [Exhibits 1F-29F].)  These materials will be discussed in detail, as necessary, below.

### C.     The July 16, 2019 Administrative Decision

Pursuant to 20 C.F.R. § 404.1520(a)(4), at **Step 1** of the sequential evaluation process, the ALJ found that Plaintiff appeared to have engaged in substantial gainful activity after the alleged onset date – *i.e.*, March 3, 2016 – through at least September 22, 2016, but the ALJ also found that there had been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity and provided findings to address that period.  (ECF No. 11, PageID.55-56.)  At **Step 2**, the ALJ found that Plaintiff had the following severe impairments:  obesity; vertigo; neurocardiogenic syncope; closed head injury; headaches; status post revision/open reduction internal fixation ("ORIF") of the right clavicle; hypertension/hypotension; Parkinson's disease; depression; and, posttraumatic stress disorder ("PTSD").  (*Id*., PageID.56-57.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that

3

met or medically equaled the severity of one of the listed impairments.  (*Id*., PageID.57-59.)  **Between Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity (RFC)[1] and determined that Plaintiff had the RFC:

> . . . to perform light work [*i.e., exertional limitations*] . . . except never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling [*i.e., postural limitations*]; must avoid unprotected heights, dangerous moving machinery, and commercial driving [*i.e., environmental limitations*]; can perform simple, routine, repetitive tasks with no production rate pace like assembly-line work with only occasional simple work-related decision-making; can maintain attention and concentration for two-hour segments [*i.e., sustained concentration and persistence limitations*]; could respond appropriately to occasional, predictable changes in the workplace [*i.e., adaptation limitations*]; could perform frequent handling and fingering with the dominant upper extremity; could perform occasional overhead reaching [*i.e., manipulative limitations*]; no more than a moderate noise level environment; could tolerate frequent exposure to extreme heat and cold, humidity, fumes, odors, dusts, gases, and poor ventilation [*i.e., environmental limitations*].

(*Id*., PageID.59-68.)  At **Step 4**, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (*Id*., PageID.68.)  At **Step 5**, the ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could

---

[1] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

4

perform.  (*Id.*, PageID.69.)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 3, 2016 through the date of the decision.  (*Id.*, PageID.70.)

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "[s]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E.     Analysis

Plaintiff's presents two issues on appeal: (1) the RFC determination fails to address and account for his disabilities and associated impairments; and, (2) the ALJ's Step 3 explanation as to Listing 2.07 ("Disturbance of labyrinthine-vestibular function") is inadequate. (ECF No. 15, PageID.1074-1081; *see also id.*,

PageID.1049.)[2]  The Commissioner argues that Plaintiff has failed to prove:  (1)
"he is more limited than found by the ALJ[;]" or, (2) "he had an impairment that
satisfied all of the criteria of Listing 2.07."  (ECF No. 20, PageID.1095-1109.)
These are addressed in reverse order to be consistent with the five-step process.

### 1.    Step 3 – Listing 2.07

The Listing of Impairments include several related to "special senses and
speech."  Listing 2.00.  Evaluation of "vertigo associated with disturbances of
labyrinthine-vestibular function, including Ménière's disease[,]" is explained at
preliminary Listing 2.00C.

By way of background, at Step 2, the ALJ determined that Plaintiff has
several severe impairments, including vertigo, but also explained why Plaintiff's
hearing issues were not a severe impairment:

> The claimant reported hearing issues at the hearing, especially with
> background noise.  During a visit with neurologist K. Nasrallah, M.D.,
> on April 15, 2016, hearing loss was noted, but the claimant reported
> that this had been present prior to the March 3, 2016, motor vehicle
> accident.  He additionally reported tinnitus (Exhibits 1F [ECF No. 11,
> PageID.378-388], 18F [ECF No. 11, PageID.775-832]).  Bilateral
> hearing loss was diagnosed by ENT physician D. Handzo, M.D., on

---

[2] This report focuses on Plaintiff's eight pages of "issues," (ECF No. 15,
PageID.1074-1081), as opposed to the first twenty-two pages of Plaintiff's brief,
which are comprised of an "introduction," "statement of the case," "pertinent
transcript citations," and "standard for judicial review[,]" (ECF No. 15,
PageID.1052-1073).  Nonetheless, the Court brings to Plaintiff's attention that the
introductory pages contain duplicative language (*id*., PageID.1060) and what
appear to be two formatting errors – each stating "Error!  Bookmark not
defined[,]" (*id*., PageID.1072-1073).

October 6, 2016, and hearing aids were recommended (Exhibit 4F [ECF No. 11, PageID.412-417; *see also id.*, PageID.573-575, 775-777]).  During the hearing, the claimant confirmed that the batteries in his hearing aids were dead.

The claimant underwent an independent medical examination on January 18, 2017, performed by neurologist W.J. Boike, M.D., and Dr. Boike noted that records he had for review reflected that hearing loss was the same as prior to the motor vehicle accident.  Hearing was intact to whisper during this evaluation (Exhibit 10F [ECF No. 11, PageID.539-544]).  The record supports that the claimant was able to work despite hearing loss, and *it fails to reflect that hearing loss and/or tinnitus results in more than minimal work-related limits*.  While a severe impairment in this regard is not found, the claimant's residual functional capacity limits *workplace noise* to the moderate level.  This would accommodate hearing difficulties reported during hearing testimony.

(ECF No. 11, PageID.56-57 (emphases added).)  Then, at Step 3 – having already

found Plaintiff's vertigo to be severe , having already explained why Plaintiff's

hearing loss and/or tinnitus were not a severe impairment, and having already

assessed a limitation on workplace noise – the ALJ simply stated, *inter alia*:  "The

record . . . does not support that the claimant has an impairment that meets the

criteria of . . . [Listing] 2.07 (Disturbance of labyrinthine-vestibular function) . . . ."

(*Id.*, PageID.62 (citing Exhibit 1A [ECF No. 11, PageID.117-132]).)[3]

---

[3] The supporting document to which the ALJ refers at Step 3 is the June 22, 2017 disability determination explanation (DDE), for which David Kroning, M.D. provided the physical RFC assessment.  (ECF No. 11, PageID.117-132 [Exhibit 1A].)  Both Listing 2.07 ("Vestibular System Disorders") and Listing 2.10 ("Hearing Loss Not Treated with Cochlear Implantation") were considered.  (*Id.*, PageID.123-124, 133.)

Plaintiff argues that the ALJ "failed to adequately explain[] findings concerning Listing 2.07 . . . [,]" and purports to explain "why [she] did meet the Listing." (ECF No. 15, PageID.1081.) "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

Plaintiff has not shown his entitlement to relief on this statement of error. Within his "statement of the case," Plaintiff claims the ALJ's Step 2 conclusion that Plaintiff's hearing loss/tinnitus was not severe and the ALJ's RFC determination that Plaintiff is limited to moderate noise level in the workplace are important "to the consideration of listing 2.07 . . . ." (ECF No. 15, PageID.1054-1055.) Yet, while Plaintiff contends that the ALJ's Listing 2.07 explanation was inadequate and purports to show why he met the listing, the entirety of Plaintiff's supporting *argument* simply states, without a single record citation:

> The Unfavorable Decision of ALJ Adamo declined to find that Plaintiff's impairments met Listing 2.07. This finding was in error. Significantly the ALJ acknowledged Plaintiff bearing impairment by incorporating a corresponding limitation into the RFC. Plaintiff's vestibular dysfunction was clearly established by the Parkinson's diagnosis, the DaTscan results, the tilt table testing and the side effects of the drug regimen. Plaintiff respectfully submits that the qualifications of Listing 2.07 have been met in the instant case.

9

(ECF No. 15, PageID.1081.)  Here, Plaintiff's very brief *statement of error* does not illustrate either "[d]isturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests[,]" Listing 2.07A, or "[h]earing loss established by audiometry," Listing 2.07B.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07.  If, as Plaintiff contends "[t]he evidence in the case establishes hearing loss by audiometry and dysfunction of the vestibular labyrinth by testing[,]" (*id.*, PageID.1055), Plaintiff's statement of error does not show how (*see* ECF No. 15, PageID.1081).  "[A] plaintiff cannot simply claim that the ALJ erred 'while leaving it up to the Court to scour the record to support this claim.'"  *Henderson v. Comm'r of Soc. Sec.*, No. CIV. 14-12675, 2015 WL 2063096, at *2 (E.D. Mich. May 4, 2015) (Parker, J.) (quoting *Deguise v. Comm'r of Social Security,* No. 12–10590, 2013 WL 1189967, at *7 (E.D. Mich. Feb.19, 2013) (Hluchaniuk, M.J.), *adopted by* 2013 WL 1187291 (Mar. 22, 2013) (Tarnow, J.)).  Accordingly, the Court should affirm the ALJ's Step 3 determination.[4]

---

[4] There seem to have been three hearing tests:  (a) on July 6, 2016, Donna M. Burton, FNP-BC, of Scott A. Baker, M.D.'s office, seems to have performed a "basic comp. audiometry" and was to schedule a "[c]aloric vestibular test with recording, bilateral; bithermal, total of 4 irrigations[,]" (ECF No. 11, PageID.585-586, 790-791); (b) an October 6, 2016 visit with Derek Handzo, D.O. of Lakeshore ENT (ECF No. 11, PageID.414, 575, 777) and a same-day audiogram with tympanogram (*id.*, PageID.416-417); and, (c) what seems to be a then-forthcoming February 14, 2017 hearing test mentioned in Plaintiff's disability report (*see* ECF No. 11, PageID.268).  Yet, while Plaintiff notes "an evaluation done by Drs. Baker and Handzo[,]" without any supporting record citation (*see* ECF No. 15, PageID.1062), Plaintiff seems to only rely upon the October 2016 evaluation (ECF

### 2.   RFC

The ALJ provided a lengthy, 10-page explanation of the RFC determination. (ECF No. 11, PageID.59-68.)  Still, Plaintiff claims that the RFC does not adequately account for several of his severe impairments and the associated limitations, such as medication side effects.  (*Id*., PageID.1074-1075; *see also* ECF No. 21, PageID.1111-1112.)[5]  The Court will address these in turn.

### a.   Vertigo, hearing loss, and tinnitus

To the extent Plaintiff challenges the ALJ's treatment of vertigo – or other inner-ear-related impairments – within the RFC, Plaintiff's appears to rely upon:

- Dr. Nasrallah's April 15, 2016 diagnosis of intermittent vertigo (ECF No. 11, PageID.379, 795);

- A May 4, 2016 physical therapy evaluation, which reflects complaint of "brief severe vertigo upon position change" (ECF No. 11, PageID.386);

No. 15, PageID.1062, 1077), because Plaintiff's references to July 2016 seem limited to a visit with Michael Ingram, M.D. of McLaren Bay Psychiatric Associates (*id*., PageID.1065), and his references to July 2017 seem limited to the July 17, 2017 records from surgeon Colleen Linehan, M.D. (*id*., PageID.1060-1061, 1078).  It is not the Court's function to comb through the record to find test results in support of Listing 2.07.  *Davis v. Comm'r of Soc. Sec*., Case No. 2:15-cv-12644, 2016 WL 4445774, at *10 (E.D. Mich. July 29, 2016) (Patti, M.J.), *report and recommendation adopted* at 2016 WL 4429641 (E.D. Mich. Aug. 22, 2016) (Leitman, J.).

[5] Although Plaintiff attempts to frame his statement of error as one challenging the ALJ's finding at Step 5, Plaintiff essentially challenges the ALJ's RFC determination by arguing that the ALJ "failed to cogently address and take into account all of Plaintiff's disability and the impairments associated thereto."  (ECF No. 15, PageID.1074-1080.)

- A November 17, 2016 dizziness handicap inventory (DHI) (ECF No. 11, PageID.468-470) and a same-day physical therapy discharge summary, which reflects that Plaintiff's DHI was then 42% percent (having been 58%) (ECF No. 11, PageID.487);

- The October 6, 2016 visit with Derek Handzo, D.O. of Lakeshore ENT, who noted that Plaintiff "has a history of Persistent positional vertigo failed in office treatment[,]" (ECF No. 11, PageID.414, 575, 777);

- The December 20, 2016 records of Robert K. Hafford, M.D., who noted a history of severe vertigo and felt Plaintiff was unable to work (ECF No. 11, PageID.547, 532, 568, 763)[6]; and,

- The June 13, 2017 consultative examination (CE) report of Nancy Gardner, Psy.D., who noted Plaintiff's report of headaches and dizziness (ECF No. 11, PageID.595, 598).

(ECF No. 15, PageID.1075-1078; ECF No. 21, PageID.1112.)

Yet, the ALJ addressed Plaintiff's hearing issues and/or tinnitus within the

Step 3 discussion, explaining that, while this was not a severe impairment, the RFC

"limits workplace noise to the moderate level." (ECF No. 11, PageID.56-57.)

Importantly, as reflected above, the ALJ accurately noted Dr. Boike's January 18,

---

[6] Opinions that are merely "administrative findings that are dispositive of a case" are reserved to the Commissioner and, therefore, are not entitled to special significance, even when opined by a treating source. 20 C.F.R. § 404.1527(d) (effective Mar. 27, 2017). Examples of such administrative findings are opinions that the claimant is disabled or unable to work. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013); 20 C.F.R. §§ 404.1527(e)(2)(i) (effective Aug. 24, 2012 to Mar. 26, 2017).

2017 report that "Hearing is intact bilaterally to whisper."  (*Id*., PageID.57, 541.)[7]

Moreover, the ALJ's RFC discussion addresses dizziness/vertigo and explains that

the limitations on "climbing and workplace hazards[,]" as well as the limitations to

"work at the light exertional level" and "no more than occasional postural

maneuvers," and "a less hazardous work environment," address Plaintiff's

vertigo/dizziness.  (ECF No. 11, PageID.62-64.)

### b.    Neurocardiogenic syncope (and blood pressure)

Plaintiff's argument as to neurocardiogenic syncope seems to rely upon:  (1)

his testimony about passing out (ECF No. 11, PageID.87-88, 93); (2) the

November 28, 2018 tilt table test, which revealed "[p]ositive head-up tilt-table test

for neurocardiogenic syncope with predominant vasodepressor component[,]"

(ECF No. 11, PageID.972); and, (3) Plaintiff's December 28, 2018, Plaintiff's

psychological progress notes, at which Plaintiff reported that he "passed out while

---

[7] If Plaintiff intended to question the ALJ's assignment of "little weight" to Dr. Hafford's December 20, 2016 opinion (ECF No. 11, PageID.532, 568, 763) or "some weight" to Dr. Boike's January 18, 2017 independent medical examination (IME) (ECF No. 11, PageID.539-544) (*see id*., PageID.67-68), then Plaintiff should have made it clear by delineating:  (a) a 20 C.F.R. § 404.1527 dispute in his Statement of Issues (ECF No. 15, PageID.1049); and, (b) a corresponding, distinct subheading within his argument (*compare* ECF No. 15, PageID.1067-1068; *with id*., PageID.1074-1081), consistent with the Undersigned's Practice Guidelines for Social Security Cases (*see* https://www.mied.uscourts.gov).  Sweeping statements like, "Of course Dr. Boike's report is totally at odds with virtually all the medical evidence in the case[,]" particularly without really saying how, will not suffice. (*Id*., PageID.1068.)

urinating and urinated all over the bathroom[,]" and "read that BP can fluctuate wh[i]le urinating . . . [,]" (ECF No. 11, PageID.1023).  (ECF No. 15, PageID.1057, 1064, 1069-1070, 1080.)

Within the RFC discussion, the ALJ referenced Plaintiff's testimony about passing out.  (ECF No. 11, PageID.59-60.)  Also, the ALJ expressly observed that "subsequent tilt table results on November 28, 2018, were positive for neurocardiogenic syncope with predominant vasodepressor component . . . ." (ECF No. 11, PageID.63.)  Moreover, the ALJ noted:

> In addition, work at the light exertional level has been defined, along with no more than occasional postural maneuvers, in order to avoid more strenuous work that may exacerbate dizziness, and to accommodate effects of elevated or depressed blood pressure, when present.  The residual functional capacity as a whole provides for a less hazardous work environment to diminish the possibility of falls.

(ECF No. 11, PageID.64.)  Thus, the ALJ assessed exertional, postural, and environmental limitations to address Plaintiff's dizziness, blood pressure and falls.

Plaintiff does not show error in the ALJ's treatment of his neurocardiogenic syncope.  First, where Plaintiff relies upon his own subjective statements – whether at the December 28, 2018 psychological session or during the April 24, 2019 administrative hearing – it is an undeveloped challenge to the ALJ's application of 20 C.F.R. § 404.1529 ("How we evaluate symptoms, including pain.").[8]  Second,

---

[8] The same can be said for Plaintiff's reliance upon the administrative hearing exchange between Plaintiff's counsel and the VE – namely, the inquiry about an

the ALJ expressly acknowledged the positive November 28, 2018 tilt table test. (ECF No. 11, PageID.63.)  Third, the RFC contains exertional, postural, and environmental limitations and a related explanation by the ALJ.  (Id., PageID.64.)  Thus, Plaintiff's statement – "[t]here is nothing in the RFC which accounts for bouts of syncope or loss of consciousness[,]" (ECF No. 21, PageID.1113) – is simply incorrect.  Finally, Plaintiff's other contentions – "[s]imply avoiding unprotected heights is clearly an inadequate accommodation" or "a limitation to simple, routine tasks does nothing to ameliorate the hazards associated with an uncontrolled syncopal condition[,]" (ECF No. 21, PageID.1113) – are conclusory.  Contrary to what Plaintiff seems to be inviting the Court to do, "[o]ur task is not to reweigh the evidence.  That is solely the province of the Secretary."  *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir. 1975)).  *See also Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 465 (6th Cir. 2004) ("We may not reweigh conflicting evidence on appeal, but instead must affirm Judge Davis's decision because substantial evidence supports it.").

### c.    Closed-head injury (and headaches)

---

employer's tolerance for loss of consciousness, as to which the VE stated, "generally an employer does not want that person back until those seizures are measured[,]" (ECF No. 11, PageID.114-115).  (ECF No. 21, PageID.1113; ECF No. 15, PageID.1072).

The ALJ concluded the Plaintiff's closed-head injury was severe at Step 2 but further concluded that Plaintiff's impairment(s) did not meet Listing 11.18 ("Traumatic brain injury").  (ECF No. 11, PageID.56-57.)  Plaintiff challenges the RFC on this point, but not the Step 3 finding.[9]  As to the RFC's alleged failure to accommodate his closed-head injury, Plaintiff cites:

- Dr. Nasrallah's April 15, 2016 diagnoses of "[t]raumatic brain injury due to a motor vehicle accident [MVA] . . . without loss of consciousness" and "postconcussion syndrome . . . [;]" (ECF No. 11, PageID.379, 795);

- the January 11, 2017 notes from Genesee ENT Associates, P.C. (seemingly Khaled M. Shukairy, M.D.), which reflect Plaintiff's report that his dizziness happens "more so when bending over or laying down and . . . will often have severe nausea and vomiting[,]" and assessments of bilateral tinnitus, bilateral sensorineural hearing loss, and seemingly also a "closed head injury[,]" (*id.*, PageID.536-537, 35);

- Dr. Nasrallah's August 8, 2017 diagnoses of "[r]ecurrent dizziness after traumatic brain injury [TBI] related to head movement, most likely due to benign positional vertigo [BPV] versus vestibulopathy . . . [,]" and "[h]eadache without migraine features, possibly secondary to tension headaches[,]" (*id.*, PageID.605-606, 746-747); and,

- Dr. Nasrallah's May 16, 2018 letter to Dr. Hafford, which reflects diagnosis of "[d]izziness after [TBI] with no significant pathologies seen on MRI of the brain[,]" "[c]hronic headaches

---

[9] Plaintiff's "statement of the case" summarizes the ALJ's Step 3 findings, including the ALJ's conclusions as to Listings 11.06, 11.18 (which Plaintiff describes as "Listing 11.8"), 2.07, 12.04, and 12.15 (*see* ECF No. 15, PageID.1055; ECF No. 11, PageID.57-58); however, Plaintiff's Step 3 challenge is limited to Listing 2.07 (ECF No. 15, PageID.1081).

> without migraine features most likely due to tension headaches possibly exacerbated by rebound headaches from medication overuse[,]" (*id.*, PageID.928, 955).

(ECF No. 15, PageID.1076-1079; ECF No. 21, PageID.1112.)

Nonetheless, Plaintiff has not shown error in the ALJ's treatment of his closed-head injury within the RFC.[10] On the subject of head injury, the ALJ pointed to Plaintiff's testimony (*id.*, PageID.60) and expressly cited these records from Dr. Nasrallah within the RFC discussion (*id.*, PageID.62-63). Ultimately, the ALJ observed, "[a]s to concentration and memory difficulties that the claimant alleged were due to the head injury, as discussed, no significant deficits in either regard have been noted during the period." (ECF No. 11, PageID.67.) Still, the ALJ explained the inclusion of certain exertional, postural, environmental and CPP – *i.e.*, sustained concentration and persistence – limitations to address his headaches, vertigo, and dizziness. (ECF No. 11, PageID.64.)

To be sure, Plaintiff's *reply brief* is somewhat more specific on the closed-head injury issue. First, Plaintiff appears to allege that the ALJ *ignored* the April 15, 2016 opinion of "Plaintiff's treating neurologist, Dr. Nasrallah . . . [,]" who

---

[10] Within his "statement of the case" – *i.e.*, not within the "issues" for appeal – Plaintiff notes a "one year" gap in the ALJ's review of the records, *i.e.*, from August 2017 to May 2018 (*see* ECF No. 11, PageID.63), and also contends that the ALJ's characterization of reports is too "benign." (ECF No. 15, PageID.1063.) If Plaintiff intended to support his closed-head injury argument with a record from that gap or by illustrating the ALJ's mischaracterization of one of Dr. Nasrallah's reports, neither is clear.

17

diagnosed TBI, post-concussion syndrome, and intermittent vertigo (ECF No. 11, PageID.379).  (ECF No. 21, PageID.1112.)  However, even if not cited for the TBI diagnosis, the ALJ expressly cites these notes with respect to Plaintiff's vertigo.  (ECF No. 11, PageID.62.)  Moreover, there is no question the ALJ addressed "head injury."  Second, the ALJ's absence of an express citation to the January 11, 2017 notes from Genesee ENT Associates with respect to dizziness does not mean that the ALJ "fail[ed] to account for" this evaluation.  (ECF No. 21, PageID.1112; ECF No. 11, PageID.536-537.)  As previously noted, the ALJ explained the inclusion of certain exertional, postural, environmental and CPP limitations to address his headaches, vertigo, and dizziness.  (ECF No. 11, PageID.64.)  Specifically, the ALJ accounted for Plaintiff's headaches by "limiting workplace noise to no more than moderate (given testimony regarding effects of noise on headaches)," "limiting exposure to pulmonary irritants," and "limiting the claimant to simple work tasks . . . ."  (ECF No. 11, PageID.64.)  "[T]he ALJ need not expressly mention every piece of evidence so long as the overall decision was supported by substantial evidence."  *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 250 (6th Cir. 2015); *see also*, *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 508 (6th Cir. 2006)  ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (citation omitted).

18

### d.    Parkinson's disease

To the extent Plaintiff argues that the RFC does not adequately address his severe impairment of Parkinson's disease, Plaintiff contends that "the progression of the Parkinson syndrome" is supported by the September 19, 2016 McLaren Bay Psychiatric Associates medication review, at which he "denie[d] any complaints of hallucinations[.]"  (ECF No. 11, PageID.395; ECF No. 15, PageID.1076.) Moreover, Plaintiff points to medical records that document Parkinson's and tremors, such as:

- Dr. Nasrallah's August 8, 2017 notes, which reflect "[i]ntermittent right arm tremor . . . [,]" although "without Parkinsonian features on examination[,]" and "no significant tremor with action."  (ECF No. 11, PageID.606, 747.)

- Dr. Nasrallah's May 16, 2018 notes, which reflect an impression of "[i]ntermittent right hand tremor at rest without other parkinsonian features[,]" and referral "to be evaluated by a movement disorder specialist."  (ECF No. 11, PageID.927-928, 954-955.)

- On June 14, 2018, Plaintiff was seen by Shana Krstevska, M.D., whose examination revealed "[f]ine coordinated movements are slow[,]" and whose diagnoses included tremor of right hand, and Parkinson's disease, with the explanation that Plaintiff has "decreased blink rate, resting tremor," and "Amantadine may be helpful."  (ECF No. 11, PageID.943.)

- The July 10, 2018 Nuclear Medicine Dopamine Transporter (DaTscan) Imaging, which revealed a "presynaptic dopaminergic pattern . . . consistent with Parkinson's disease/Parkinsonian syndrome."  (ECF No. 11, PageID.934, 957.)

- Dr. Nasrallah's August 21, 2018 letter, who noted "evidence of resting tremor of the right upper extremity with mild cogwheel rigidity[,]" and "decrease[d] arm strength on the right side[,]" and intended to prescribe Amantadine.  (ECF No. 11, PageID.936-937, 958-959.)

- An October 31, 2018 letter from Dr. Nasrallah, who noted "evidence of mild cogwheel rigidity on the right side" and "decreased arm swing on the right side" and whose plan included "increase the dose of amantadine . . . .  If his tremor does not improve and the possibility of autonomic dysfunction is excluded, I will consider starting him on Sinemet."  (ECF No. 11, PageID.969-970, 974-975.)

- The April 17, 2019 letter from Dr. Nasrallah's office, which notes Plaintiff's report "that the hallucinations started about four months ago[,]" and notes "[m]ild cogwheel rigidity on the right" and "decreased arm swing on the right side . . . ."  (ECF No. 11, PageID.1040-1042.)

(ECF No. 15, PageID.1078-1080; ECF No. 21, PageID.1115.)  Also, Plaintiff contends that the July 10, 2018 DaTscan is consistent with Dr. Nasrallah's reported findings.  (ECF No. 15, PageID.1079-1080.)

Plaintiff contends that the ALJ "grossly understates" the problems associated with Plaintiff's Parkinson's disease (ECF No. 21, PageID.1115); however, he has not shown error in the ALJ's treatment of Parkinson's disease within the RFC. The ALJ's RFC discussion makes several references to Parkinson's and tremors (*see* ECF No. 11, PageID.60, 63-66), including express citations to the documents Plaintiff cites.  (*Id.*, PageID.63-64.)  The ALJ assessed the limitations of "frequent

handling and fingering with the dominant upper extremity" to accommodate his shoulder fracture and tremors.  (*Id.*, PageID.59, 62, 64.)  Plaintiff's statement of error does not seem to address the handling and fingering limitations.  (ECF No. 15, PageID.1074-1080).  Moreover, in his reply, Plaintiff contends that his tremors are not addressed by the RFC's environmental limitations on workplace noise and pulmonary irritants.  (ECF No. 21, PageID.1115.)  Even if that is true, it says nothing of the manipulative – *i.e.*, handling and fingering – limitations assessed by the ALJ.  As the ALJ noted, "[a]s to vertigo/dizziness and more recent effects of Parkinson's, as discussed, the claimant denied any significant effects of tremors as of the most recent visit with Dr. Nasrallah on April 19, 2019.  He also denied falls and balance problems, and only occasional dizziness was reported."  (ECF No. 11, PageID.64; *see also* ECF No. 11, PageID.1040 ("His tremor is primarily located in the right arm and right leg and Rodney reports that it has not caused any significant interference with dressing, grooming, eating or drinking.  He does have some tremor when he holds a cup, but has had no spillage.").)  Accordingly, it was within the ALJ's zone of choice to conclude that the RFC "as a whole provides for a less hazardous work environment to diminish the possibility of falls[,]" and "in limiting handling and fingering," accommodates "tremors, albeit mild[.]"  (*Id.*)  *See Buxton v. Halter*, 246 F.3d 762, 772-773 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record

substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference.") (citation omitted).  Plaintiff's suggestion that the RFC does not include "limitations relative to the Parkinson's symptoms and diagnosis[,]" (ECF No. 21, PageID.1116), is not convincing.

### e.    Side effects

Plaintiff also challenges the RFC's accommodation for the side effects of his medication.  (ECF No. 15, PageID.1075, 1076, 1080.)  Presumably, this is a challenge the ALJ's consideration of "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]"  20 C.F.R. § 404.1529(c)(3)(iv).

During the administrative hearing, the ALJ asked Plaintiff about his medications for depression (*e.g.*, Cymbalta and at one time Buspirone), for which he was not aware of any side effects.  (ECF No. 11, PageID.100-101.)  Also, the ALJ asked about Plaintiff's medications for the Parkinson's diagnosis (*e.g.*, Amantadine, Carbidopa-levodopa (Sinement)), which may be causing hallucinations.  (ECF No. 11, PageID.104-106.)  Thus, it is not surprising that the ALJ's RFC determination contains several references to Amantadine, Nuplazid, Sinemet (Carbidopa-levodopa), Buspirone, and/or Cymbalta.  (ECF No. 11, PageID.63-65.)  Indeed, the ALJ expressly mentioned Dr. Nasrallah's April 17,

2019 impression that Plaintiff's hallucinations were "possibly associated with Parkinson's disease or potentially a side effect from amantadine." (ECF No. 11, PageID.64, 1041.) The ALJ also cited Dr. Nasrallah's plans to: (i) start Nuplazid, which the "FDA approved for hallucinations associated with Parkinson's disease[;]" (ii) start Sinemet; and, (iii) "[f]or the time being," to "continue amantadine at the same dose and . . . call in one week to report any dyskinesias [or] worsening of hallucinations or any improvement in tremor[,]" and "discuss weaning the patient off amantadine at that time." (*Id*.)

Plaintiff has not shown how the RFC fails to accommodate medication side effects. Although Plaintiff's "statement of the case" mentions medication side effects – such as those from Amantadine (*e.g.*, hallucinations), Nuplazid (*e.g.*, extremity swelling, nausea, confusion, hallucinations and gait abnormalities), Sinemet (*e.g.*, dizziness), Buspirone (*e.g.*, confusion and incoordination), and/or Cymbalta (*e.g.*, headaches and dizziness) (ECF No. 15, PageID.PageID.1063-1064, 1066) – Plaintiff's argument *generally* refers to "the side effects of the medications prescribed to address the conditions," or "the myriad of side effects associated with Plaintiff's medications[.]" (ECF No. 15, PageID.1075, 1080.) And, while Plaintiff's argument specifically refers to the September 19, 2016 medication review notes from McLaren Bay Psychiatric Associates – which reflect Plaintiff's denial of "any complaint of *hallucinations*," (ECF No. 11, PageID.395

23

(emphasis added)) – as "lend[ing] credence to the progression of the Parkinson syndrome coupled with medication side effects[,]" (ECF No. 15, PageID.1076), Plaintiff does not explain what further limitation is needed to accommodate hallucinations.  In fact, the ALJ noted that "[t]he evidence fails to substantiate that hallucinations will not be addressed with treatment," such as the aforementioned, FDA approved Nuplazid and the plan to wean him off of Amantadine.  (ECF No. 11, PageID.64.)  Nor is the Undersigned persuaded by Plaintiff's reply, wherein he contends in conclusory fashion that the RFC's *environmental* limitations on workplace noise and pulmonary irritants do not address his hallucinations.  (ECF No. 21, PageID.1115.)

### f.    Off-task

Plaintiff advocates that his limitations result in a work-preclusive "off-task percentage."  (ECF No. 15, PageID.1071, 1080.)  At Step 3, the ALJ found that Plaintiff was moderately limited with regard to CPP, and, within the RFC determination, assessed sustained concentration and persistence (CPP) limitations – namely, "simple, routine, repetitive tasks with no production rate pace like assembly-line work with only occasional simple work-related decision-making[,]" and "attention and concentration for two-hour segments."  (ECF No. 11, PageID.58-59; *see also id*., PageID.67, 112.)

Plaintiff's brief mention of the VE's off-task testimony and Plaintiff's suggestion that incorporating certain limitations would result in a work-preclusive off-task percentage (*see* ECF No. 15, PageID.1071, 1080; ECF No. 21, PageID.1115-1116) do not illustrate how the CPP limitations – in particular the limitation on pace – fail to account for the time Plaintiff would be off-task. Moreover, Plaintiff's citation to the June 13, 2017 consultative examination (CE) report of Nancy Gardner, Psy.D., who concluded Plaintiff's "prognosis for improved psychological and adaptive functioning is guarded[,]" (ECF No. 11, PageID.598), does not assist Plaintiff's cause.  (ECF No. 15, PageID.1077-1078.) The ALJ expressly cited Dr. Gardner's report when considered the functional factors at Step 3 and when discussing Plaintiff's RFC.  (ECF No. 11, PageID.58, 67, 598.)  And, notwithstanding the CE's conclusion that Plaintiff was able to understand simple and complex instructions, the ALJ concluded that Plaintiff had moderate limitations in CPP and assessed both CPP-related limitations and the adaptive limitation of "occasional, predictable changes in the workplace[.]"  (*Id*.) In sum, Plaintiff has not shown that he would be off-task "more than ten percent of the workday."  (ECF No. 11, PageID.114.)[11]

---

[11] In the "pertinent transcript citations" section of his brief, Plaintiff mentions the VE's testimony about breaks in the workplace (ECF No. 11, PageID.113-114) and contends that the ALJ's hypothetical does not specify the two 15-minute breaks and one 30-minute lunch.  (ECF No. 15, PageID.1071.)  However, these appear to be normal break times, or, as Plaintiff states, "implication at best."  (*Id*.)

### g. Right clavicle

As to the clavicular injury, Plaintiff argues that "the history provided to the orthopod in 2017 clearly was at odds with the history recited by the ALJ." (ECF No. 15, PageID.1078-1079.) Specifically, Plaintiff points to:

- The July 17, 2017 notes from Covenant Center for Advanced Orthopaedics, wherein Lindsey Pilling, P.A. documents that Plaintiff's pain was "10 out of 10," and "worsened with using his arm and reaching up[,]" (ECF No. 11, PageID.612), and also that Plaintiff "wishes to proceed with surgery if there is one for him[,]" (*id.*, PageID.614);

- The October 10, 2017 surgical notes of Colleen Linehan, M.D., who "applied a superior 6H Accumed plate[,]" and "implanted screws on each side of the fracture . . . [,]" (ECF No. 11, PageID.624; *see also id.*, PageID.636-639);

- The November 30, 2017 visit with Michael J. Tucker, D.O. for "continued right collarbone pain following an ORIF of the right clavicle to repair a nonunion fracture that was performed on 10-10-17 by Dr. Linehan[,]" (ECF No. 11, PageID.642); and,

- The December 7, 2017 operative notes of Michael J. Tucker, D.O., who removed a right clavicle deep implant and repaired a malunion of the right clavicle (ECF No. 11, PageID.652).

(ECF No. 15, PageID.1078-1079, 1080.)

Plaintiff's right clavicle argument is unavailing. Preliminarily, within the RFC determination, the ALJ cited Plaintiff's testimony about his collarbone surgeries, expressly noted the "initial surgery (ORIF)" in October 2017 and the

"revision surgery" in December 2017, and explained why Plaintiff's "allegations of having no function in his right arm prior to a second surgery is inconsistent with the medical evidence." (ECF No. 11, PageID.60-62.) Nonetheless, the ALJ explained that the RFC limits "use of the right hand for handling and fingering and it limits overhead reaching to occasional to avoid re-injury or irritation of the shoulder[,]" and "lifting to the light exertional level . . . ." (*Id.*, PageID.62.) Thus, contrary to Plaintiff's statement that the ALJ's RFC determination does not incorporate "the disabling aspects of the clavicular injury," which "extended for well over one year," (ECF No. 21, PageID.1114), the ALJ assessed exertional and manipulative limitations to address Plaintiff's clavicle/shoulder fracture.

Moreover, Plaintiff does not effectively challenge the ALJ's review of the clavicle fracture records. Plaintiff suggests that the ALJ mischaracterized Dr. Behan's records from 2016 (ECF No. 11, PageID.61, 775-832). (ECF No. 15, PageID.1059-1961; ECF No. 21, PageID.1114.) Yet, the ALJ's discussion of Plaintiff's clavicle fracture spans not only the period from the March 3, 2016 motor vehicle accident to the November 9, 2016 x-rays, but also the period from July 17, 2017 to March 6, 2018 (*see* ECF No. 11, PageID.61-62). Indeed, and as the ALJ somewhat acknowledged, the March 6, 2018 notes indicate: "The patient states he is doing well today and really has no pain or other problems except for weakness. He would like to begin bowling." (ECF No. 11, PageID.924, 962; *see*

*also id.*, PageID.62.)  And, albeit earlier in ALJ's RFC discussion, the ALJ

referenced Plaintiff's April 24, 2019 administrative hearing testimony as follows:

"he has been unable to bowl, as his right arm remains 'a little' weak, but he

confirmed that the shoulder is 'overall' better since surgery."  (ECF No. 11,

PageID.60; *see also id.*, PageID.92.)   Notwithstanding the conclusion that

"allegations with regard to the shoulder fracture, overall, are inconsistent with the

medical evidence," the ALJ assessed the aforementioned manipulative and

exertional limitations, "given this [*i.e.*, clavicle/shoulder fracture] history[.]"  (*Id.*,

PageID.62).

   To the extent Plaintiff contends that "subsequent records reveal the

clavicular fracture was far from resolved at that juncture[,]" (ECF No. 15,

PageID.1059; ECF No. 21, PageID.1113-1114), or to the extent Plaintiff

challenges his ability to "even occasionally work overhead with his dominant right

arm" as "simply not credible given his subsequent course[,]" (*id.*, PageID.1114),

he has not shown error in the ALJ's review of that period – *i.e.*, from July 17, 2017

to March 6, 2018 (ECF No. 11, PageID.61-62).  Indeed, the ALJ noted that August

2018 and November 2018 records from List Psychological reflect that Plaintiff had

"helped his sister put trim up on her windows in her house" and "work[ed] on his

car" and "replac[ed] a floor and a door." (ECF No. 11, PageID.66, 68, 1008, 1010, 1016.)[12]

## F. Conclusion

In the end, Plaintiff has the burden of proof on his statement(s) of error. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five."). He has not shown legal error in the ALJ's Step 3 or RFC determinations. For the foregoing reasons, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for remand pursuant to Sentence Four (ECF No. 15), **GRANT** Defendant's motion for summary judgment (ECF No. 20), and **AFFIRM** the Commissioner of Social Security's decision.

## III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

---

[12] To the extent Plaintiff challenges the ALJ's conclusion that these records were not consistent with Plaintiff's shoulder fracture allegations (*see* ECF No. 11, PageID.61-62; ECF No. 15, PageID.1075), or the extent Plaintiff mentions shoulder pain or advocates that his right clavicle condition will result in a work-preclusive "rate of absenteeism" (*see* ECF No. 15, PageID.1071, 1078, 1080; ECF No. 21, PageID.1116; and ECF No. 11, PageID.114, 373), he has not made a developed challenge to the ALJ's application of 20 C.F.R. § 404.1529 ("How we evaluate symptoms, including pain.").

72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must precisely recite the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  January 11, 2022

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE